CULPEPPER, Judge.
Plaintiff seeks workmen’s compensation benefits for total and permanent disability resulting from traumatic neurosis. From an adverse judgment, plaintiff appealed.
The substantial issue is whether plaintiff has sustained his burden of proof that he is suffering from traumatic neurosis.
The accident occurred on July 21, 1965. Plaintiff, a 36-year-old negro male, was working as a common laborer for the defendant, Lafayette Well Service, Inc. He was on his knees scraping paint from a steel deck beneath a steel table. A fellow-worker jokingly squirted him in the back with an air compressor hose. Plaintiff jerked up and hit the top of his head on the bottom of the steel table. He was not rendered unconscious but says he felt dizzy and requested to see a doctor.
On the day of the accident plaintiff was seen by Dr. J. Boring Montgomery, a general practitioner of Lafayette, Louisiana. Dr. Montgomery testified he could find no visible sign of injury to the skull or neck. He prescribed a drug and instructed plain *213 tiff to return in five days. This physician saw plaintiff again on July 26, 1965 and, still finding no external signs of injury, discharged him.
On September 30, 1965, plaintiff was examined by Dr. William L. Zinc, a surgeon in Lafayette. The complaints were headaches and stiffness in the neck. Dr. Zinc found some restriction in movement of the neck and recommended physiotherapy treatments which were commenced.
On November 5, 1965, plaintiff was seen by Dr. Richard C. Corales, a neurosurgeon. The neurological examination was negative but Dr. Corales recommended the physiotherapy treatments be continued by Dr. Zinc.
Dr. Fred C. Webre, an orthopedic surgeon of Lafayette, examined plaintiff on February 14, 1966. This physician found no orthopedic abnormalities and was of the opinion plaintiff could return to work.
On February 21, 1966, Dr. Zinc discharged plaintiff as having received maximum benefit from the physiotherapy treatments.
Defendants paid weekly compensation from the date of the accident until some time in February of 1966 when the physicians reported plaintiff had no further physical residuals of the accident. Plaintiff did not return to work from the date of the accident to the date of trial on June 19, 1969.
On October 13, 1966, plaintiff was seen for the first time by Dr. William P. Cloyd, Jr., a psychiatrist of Lafayette. Dr. Cloyd ordered psychological testing which was done by Dr. William A. Hawkins, a psychologist of Lafayette. On the basis of these psychological tests and his own clinical examination, Dr. Cloyd diagnosed plaintiff’s condition as “A mild to moderate mental defector with conversion symptoms.” With reference to the psychological tests, Dr. Cloyd commented they showed plaintiff had apparently functioned at common labor jobs requiring an IQ of about 70 before the accident — as, for instance, his work on construction jobs, in the oil fields and in the rice fields. However, the psychological tests showed that on the date of these tests, December 7, 1966, plaintiff’s IQ was below 40 and he had a mental age of only approximately three years. The conversion reaction symptoms mentioned by Dr. Cloyd were headaches, impairment of hearing and some other vague physical complaints.
At the request of defendants, plaintiff was examined on November 2, 1967, by Dr. Kenneth A. Ritter, a psychiatrist of New Orleans. This physician’s qualifications are very impressive and include certification by the American Board of Neurology and Psychiatry since 1955. Because of many discrepancies discovered during this examination, Dr. Ritter concluded that plaintiff was consciously feigning illness and that he did not have traumatic neurosis. In particular, Dr. Ritter mentioned that plaintiff pretended to have low intelligence and a poor memory but in certain areas his intelligence and memory were functionally good and certainly well above that of a three year old child. Also, plaintiff pretended to be deaf but his deafness varied a great deal during the examination. Dr. Ritter’s opinion is summarized from the following portion of his testimony:
“When I asked this man to count numbers I was trying to assess his intelligence and his general grasp of knowledge and educational level. When I asked • him to count numbers he said he was able to count and then he started, ‘One, two, four, six, nine, fifteen.’ When I asked him to add three and two his answer was eight, and when I asked him to add four and two he gave me the same answer eight. Yet while giving me the names of his six children he gave me four names promptly and then asked how many he had given me. And then he gave me the names of the following two indicating that he was able to add four and two correctly.
*214 “On a number of other occasions I asked him questions in a low voice when he was distracted and he replied promptly without any indication of deafness at all. This deafness varied a great deal during the time that I was examining him. Incidentally I might say that I felt that this man’s educational level was poor. I suppose basically illiterate and that he was certainly far from the brightest person in the world, but I did not consider him retarded.”
With reference to the psychological tests given by Dr. Hawkins, and similar tests made by another psychologist, Dr. O. Randall Braman of New Orleans, it was Dr. Ritter’s opinion that the very low IQ shown by these tests was the result of plaintiff feigning mental disability. Dr. Ritter testified that it was “entirely possible for someone to do this on a psychological test as well as a clinical examination.”
Dr. Hawkins concedes that psychological tests are purely subjective. Under cross-examination Dr. Hawkins testified as follows :
“Q But in this particular case, you are telling me that on your tests the scores were so low you really could not get one.
“A. Right. The highest he got was a mental age of around three.
“Q Here we have a man who can dress himself, he can tie his shoes. He can remember all of the facts surrounding his accident, what happened, he can remember the doctors he went to, he can remember the names of all of his children, his two wives, he can tell you how many children he had with his first wife and how many with his second wife and isn’t there something wrong in this somewhere doctor?
“A Not at the time I examined him. He could not remember all this that you are telling me now.
“Q Now, if he testified to these facts on the date of trial isn’t there a discrepancy of great magnitude in the results of your testing and what he can testify to on trial ?
“A I think if he can testify to all that then there has been some recovery in some areas.
“Q Or there could be malingering in this case ?
“A I could not say this professionally.”
The lay testimony of plaintiff’s first and second wives, his father and other relatives is generally to the effect that before the accident plaintiff worked regularly but since the accident he has not worked, is hard of hearing and appears to be confused. The trial judge saw and heard plaintiff and these lay witnesses. It is apparent he gave little weight to their testimony. In his written opinion the district judge concluded:
“The Court is of the opinion that the plaintiff has failed to prove his claim of psychoneurotic disability by a reasonable preponderance of the evidence. The plaintiff’s complaints are vague, of a subjective nature, and the Court found many instances of contradiction. The evidence in a case such as this must be subjected to careful scrutiny because of the subjective nature of the disability.
“The Court is of the opinion that the plaintiff has been feigning many, if not all, of his complaints. For these reasons, the Court will reject the demands of the plaintiff.”
Our jurisprudence is established that when a workmen’s compensation claim is based on traumatic neurosis or conversion reaction the evidence supporting such a claim must be carefully scrutinized due to the nebulous and easily feigned symptoms of such a condition. See Romero v. Travelers Insurance Co., 198 So.2d 191 (3rd Cir. 1967) writ of certiorari refused, 250 La. 931, 199 So.2d 926; Jackson v. In *215 ternational Paper Co., 163 So.2d 362 (3rd Cir. 1964) and the cases cited therein.
We notice that in the recent case of Cain v. Travelers Insurance Co., 244 So.2d 619 (4th Cir. 1971) writs were denied by our Supreme Court but several justices indicated disagreement with “the sweeping statements in the opinion on proof of traumatic neurosis.” We do not know what particular portions of the Cain decision the justices of our highest court found objectionable. Nevertheless, in the present case we have used only the standard of proof stated above and supported by the cited authorities.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the plaintiff appellant.
Affirmed.